UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN RE:

ANCHOR GLASS CONTAINER
CORPORATION
_____

ENCORE GLASS, INC.

        Appellant,

v.     Case No. 8:03-cv-2679-T-24EAJ

ANCHOR GLASS CONTAINER
CORPORATION,

        Appellee.
_____/

**O R D E R**

This cause comes before the Court on an appeal from the United States Bankruptcy Court for the Middle District of Florida. Appellant, Encore Glass, Inc. ("Encore"), filed an Initial Brief and Reply Brief (Doc. Nos. 15 and 24) and Appellee, Anchor Glass Container Corporation ("Anchor"), filed an Answer Brief (Doc. No. 22).

**I.     Standard of Review**

This Court independently reviews the bankruptcy court's decision. See In re Bush, 62 F.3d 1319, 1322 (11th Cir. 1995). The bankruptcy court's findings of fact are subject to a clearly erroneous standard of review, and the bankruptcy court's conclusions of law are reviewed *de novo*. See id.; In re Fin. Federated Title & Trust, Inc., 309 F.3d 1325, 1328-29 (11th Cir. 2002).

**II.     Background**

Encore and Consumers Packaging, Inc., d/b/a Consumer Glass ("CPI"), and later Anchor, had a contractual relationship dating from 1996. (Bank. Doc. No. 1420, Exh. 1).[1] CPI is a Canadian corporation that used to be Anchor's parent corporation. (Bank. Doc. No. 1419). Under a series of agreements, CPI and Anchor supplied Encore with glass containers of a specific type and quality for the wine industry. (Bank. Doc. No. 1084, Evans Aff., ¶7).

In November 1996, Encore and CPI executed a Volume Purchase Agreement which was effective from January 1, 1997 to December 31, 1999 ("the 1996 Agreement"). On May 21, 1998, Encore entered into a Volume Purchase Agreement with Anchor, but not CPI, that was to become effective January 1, 2000 (the "Agreement"). (Bank. Doc. No. 1420, Exh. 4). The Agreement was silent about the location of the plant or facility which would be used to produce wine bottles for Encore. Under the Agreement, the rebate discount schedule ranged from 1 percent to 2.5 percent. The Agreement included a provision requiring that the Anchor had to accept a purchase order before the obligation to produce would arise. The Agreement did not require Encore to purchase a minimum quantity of bottles.

On or about June 24, 1999, Encore entered into an Amended and Restated Volume Purchase Agreement with Anchor and CPI that was to become effective January 1, 2000 (the "Amended Agreement"). (Bank. Doc. No. 1420, Exh. 6). The recitals in the Amended Agreement state in part: "'[t]he parties desire to amend and restate the May 21, 1998 Agreement in its entirety" and "[t]he parties contemplate that the products (as hereinafter defined) shall be

---

[1] Citations to the record before the bankruptcy court will be designated as "(Bank. Doc. No. __ ).

manufactured at CPI's Lavington facility" (the "Lavington Plant").[2]  When the Amended Agreement was executed, the Lavington Plant was the only plant owned by either CPI, Anchor or an Anchor affiliate, which was approved to meet Encore's production requirements.  (Bank. Doc. No. 1415, ¶10).

Under the Amended Agreement, CPI agreed to make "certain capital improvements" to the Lavington Plant.  In addition, the Amended Agreement contained a more generous rebate and discount schedule than the Agreement.  Specifically, the Amended Agreement called for volume rebates (between 2 percent and 7 percent) to be paid to Encore based upon the volume of bottles sold to Encore.

The Amended Agreement did not require Encore to purchase a minimum quantity of bottles.  Instead, as stated in the recitals, it provided that "[t]he parties contemplate that [Encore] will purchase from [CPI and Anchor] and [CPI and Anchor] will sell to [Encore] certain glass containers and services such as container decorating and similar items on an ongoing basis." The Amended Agreement called for Encore "to issue purchase orders to [CPI and Anchor] from time to time."  The terms of the Amended Agreement were to be incorporated into these purchase orders.  Again, once a purchase order was issued, CPI and Anchor had to decide whether to "accept" the purchase order before they became obligated to produce.  Under the Amended Agreement, Encore purchased a percentage of the total product it required from CPI and Anchor. The remainder of Encore's product requirements were supplied by Vitro Packaging, Inc. ("Vitro").  (Bank. Doc. No. 1984, Evans Aff., ¶11).  The Amended Agreement also stated

---

[2]Located in Lavington, British Columbia, Canada.

that "[t]his Agreement shall be construed and enforced in accordance with the laws of the State of California."

In May 2001, CPI filed for bankruptcy under Canadian law (the "CPI Bankruptcy"). (Bank. Doc. No. 1415, ¶2). In approximately August 2001, during the course of CPI's bankruptcy proceedings, Owens-Illinois ("Owens") purchased CPI's assets, including the Lavington Plant. (Bank. Doc. No. 1415, ¶3). Owens did not assume CPI's obligations under the Amended Agreement. (Bank. Doc. No. 1415, ¶4). By a letter dated October 12, 2001, Anchor notified Encore that it considered itself relieved of all of its obligations under the Amended Agreement due to the sale of the Lavington Plant. (Bank. Doc. No. 1415, Exh. B thereto). After receipt of the October 12, 2001 letter, Encore did not submit any further purchase orders under the Amended Agreement. (Bank. Doc. No. 1415, ¶6).

On November 6, 2001, following the sale of the Lavington Plant, Encore entered into a Volume Purchase Agreement with Vitro to purchase the additional bottles that Encore needed (the "Vitro Agreement"). According to Encore, the Vitro Agreement does not provide Encore with the same level of volume rebates and discounts as Encore received under the Amended Agreement with CPI and Anchor. The loss of the these rebates and discounts makes up Encore's claim in this case. (Bank. Doc. No. 1084, Evans Aff., ¶¶17-19).

On April 15, 2002, Anchor Glass filed for bankruptcy under Chapter 11. On May 23, 2002, Encore filed a Proof of Claim in the amount of $6,102,912.60 ("the Claim"[3]). On July 18, 2002, Anchor Glass filed its Objection to the Claim ("the Objection"). On January 30, 2003,

---

[3]The Court notes that despite being designated in appeal (Doc. No. 1), and subsequent efforts by the Clerk of this Court to obtain the documents from the bankruptcy court, the record before this Court does not contain copies of the Claim, the Objection, and the Amended Claim.

4

Encore filed an Amended Proof of Claim in the amount of $6,838,904.59 ("the Amended Claim").  (Bank. Doc. No. 1415, ¶¶ 7-9).

On February 20, 2003, Encore filed its Motion for Partial Summary Judgment on Debtor's Objection to Proof of Claim No. 253 Filed By Encore Glass, Inc. (Bank. Doc. No. 1083).  On May 16, 2003, Anchor Glass filed its Motion for Summary Judgment and Opposition to Encore's Pending Motion for Partial Summary Judgment. (Bank. Doc. No. 1419).  On July 24, 2003, the bankruptcy court entered its Order on Cross Motions For Summary Judgment Filed by Debtor, Anchor Glass Container Corporation, and By Claimant, Encore Glass, Inc. in which it granted summary judgment in favor of Anchor and denied Encore's motion for partial summary judgment ("Summary Judgment Order").  (Bank. Doc. No. 1491).  On August 4, 2003, Encore filed the instant appeal (Bank Doc. No. 1503).[4]

### III.     Discussion

### A.     Bankruptcy Order Being Appealed

The bankruptcy court based its order granting summary judgment in Anchor's favor on two separate grounds.  (Bank. Doc. No. 1491).   First, the bankruptcy court found that the

---

[4]The Court notes that this case has had a somewhat protracted history since Encore filed its Notice of Appeal.  On January 30, 2004, this Court entered an Order granting the parties' Stipulation and Joint Motion for Entry of Order Abating Appeal and relinquished jurisdiction to the bankruptcy court as necessary to permit the bankruptcy court to enter a final order.  (Doc. No. 7).  On May 20, 2005, this Court entered an Order granting the parties' Agreed Motion for Entry of Order Lifting Abatement of Appeal and set a deadline for Encore to serve its initial brief. (Doc. No. 11).  On August 16, 2005, Anchor filed a Notice of Suggestion of Bankruptcy which stated that Anchor filed a petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court, Middle District of Florida, Case No. 8:05-bk-15606, on August 8, 2005.  (Doc. No. 18).  On September 9, 2005, this Court entered an Order staying this case pursuant to the provisions of 11 U.S.C. § 362.(Doc. No. 21).  Subsequently, on November 23, 2005, this Court granted Encore's motion to reopen the case and returned the case to active status.  (Doc. No. 25).

Amended Agreement is an unenforceable indefinite quantity supply contract. Second, the bankruptcy court found that "performance is now impossible and performance is excused because the Amended Agreement required that production occur at the Lavington plant."

### B. Encore's Arguments on Appeal

Encore contends that the bankruptcy court erred by failing to properly apply California law, which Encores argues controlled the application and interpretation of the Amended Agreement. Specifically, Encore argues that by ignoring California law, the bankruptcy court erred in determining that the Amended Agreement was an unenforceable indefinite quantity supply contract. Rather, Encore contends the Amended Agreement was an enforceable requirements contract. Encore further argues that the bankruptcy court erroneously concluded that the Amended Agreement restricted manufacture of product to the Lavington Plant and that the sale of the Lavington Plant by CPI excused Anchor's performance under the Amended Agreement.

### C. The Bankruptcy Court's Legal Conclusions Are Supported By California Law

The sole issue before this Court is one of contract interpretation. The Amended Agreement is controlled by California law. Under California law, a contract is construed to give effect to the parties' intentions at the time the contract was formed. See Hensler v. City of Los Angeles, 268 P. 2d 12, 17-18 (Cal. App. 2 1954). The parties' intentions must, in the first instance, be determined from the language of the contract. See id. at 18. Additionally, under California law, "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." Cal. Civ. Code §1641.

With these principles in mind, this Court finds that the bankruptcy court's legal conclusions adhere to basic principles of contract law[5] and would have been the same under California law. Therefore, the bankruptcy court did not err in its determination that the Amended Agreement is an unenforceable indefinite quantity supply contract. Furthermore, the bankruptcy court did not err in its determination that Anchor's performance is excused under the Amended Agreement.

### 1. The Amended Agreement Is Not a Valid Requirements Supply Contract[6]

Generally speaking, "[a] contract for sale must be definite and certain as to the quantity of the goods or articles sold, or provide means, by some fixed conditions or circumstances, by which the quantities involved in the contract can be determined." See 77A C.J.S. *Sales* § 75 (citing Kocher v. Cartman Tire Exch., 291 P. 856 (Cal. App. 1. Dist. 1930)). Under California law, a true requirements contract exists where the seller agrees to supply all of the buyer's

---

[5]The Court notes that several of the cases cited by the bankruptcy court were from the United States Court of Federal Claims and the United States Court of Appeals for the Federal Circuit and pertained to contracts with the United States Federal Government.

[6]Requirements contracts are governed by § 2-306 of the Uniform Commercial Code ("U.C.C"), Output, Requirements and Exclusive Dealings:

> (1) A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.
>
> (2) A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale.

Accord Cal. Com. Code §2306.

requirements. See Mozaffarian v. Breitling, 1998 WL 827596, *8-9 (N.D. Cal. 1998); see also Fisher v. Parsons, 29 Cal. Rptr. 210, 213 (Cal. App. 2. Dist. 1963). That is, "[a] promise to buy all that the promisor requires or needs in its business from the promisee constitutes a valid consideration for the vendor's promise to furnish the goods or merchandise which the promisor may need." El Rio Oils, Canada Ltd. v. Pacific Coast Asphalt Co., 213 P.2d 1, 5 (Cal. App. 2. Dist. 1949). Conversely, "where one party's promised performance depends upon that party's wish, will or desire or where one party is free to perform or withdraw at its unrestricted pleasure the promise of that party is illusory and is not sufficient consideration for the other party's promise." J.C. Millet Co. V. Park & Tilford Distillers Corp., 123 F. Supp. 484, 493 (N.D. Cal. 1954).

     As the bankruptcy court found, the elements of a requirement supply contract are not present in this case. Most importantly, Encore was not required to buy any product from CPI and Anchor. Rather, at its sole discretion, Encore could submit purchase orders for wine bottles that had to be accepted. Furthermore, Encore was not required to buy all its goods exclusively from CPI and Anchor. The Amended Agreement is silent as to this element and the record before this Court reflects that CPI and Anchor were not Encore's exclusive suppliers. In short, the Amended Agreement was a "one-way street" where Encore could have taken some or all of its business elsewhere at any time without recourse by CPI and Anchor.

     Encore argues that the Amended Agreement, when taken "in its entirety", demonstrates that the parties intended to be bound to the purchase and sale of certain amounts, since the Amended Agreement references Encore's anticipated needs and requirements and contemplates that Encore would be an exclusive distributor if it purchased product at a certain level.

Notwithstanding Encore's characterization to the contrary, the plain language of the Amended Agreement compels the conclusion that the Amended Agreement was not a requirements contract. See Copylease Corp. of Am. v. Memorex Corp., 397 F. Supp. 853, 855 -56 (S.D.N.Y. 1975)(applying California law).

When there is nothing in a writing which requires a party to take, or limits its demand to, any ascertainable quantity, a contract is not enforceable for lack of consideration and mutuality. See Willard, Sutherland & Co. v. United States, 262 U.S. 489, 493 (1923); see also Mattei v. Hopper, 330 P.2d 625, 626 (1958). In contract law parlance, this type of contract may be referred to as an indefinite quantities contract. See Mason v. United States, 615 F.2d 1343, 1347 (Ct. Cl. 1980). The Amended Agreement is tantamount to an indefinite quantity supply contract, since it contains no definite minimum purchase amount and Encore was clearly free to purchase nothing from CPI and Anchor. Rather, the Amended Agreement merely provides that Encore will purchase product as it may desire. Specifically, by the express language of the Amended Agreement, Encore could choose if and when it ordered product from CPI and Anchor, as well as how much product that it wished to order from CPI and Anchor. CPI and Anchor were not obligated to produce a specific volume for Encore.

For these reasons, this Court affirms the bankruptcy court's finding that the Amended Agreement is not a requirements contract. Rather, the Court finds the Amended Agreement is an unenforceable indefinite quantities contract, since the parties have not contracted to buy or sell a readily ascertainable quantity.

## 2. **The Amended Agreement Was Rendered Impossible By The Sale of CPI's Lavington Plant**

Even if Encore could establish that the Amended Agreement is an enforceable requirements contract, the bankruptcy court properly concluded that production at the Lavington Plant was an integral part of the Amended Agreement and that performance under the Amended Agreement was rendered impossible when CPI sold its Lavington Plant during the course of CPI's bankruptcy proceeding.

### a. The Amended Agreement Required Production At The Lavington Plant

Encore argues that the Amended Agreement did not restrict production of product to the Lavington Plant. To support its contention that Anchor might supply containers from other plants, Encore cites to paragraph 31 of the Amended Agreement, which states:

> In the event that Anchor or CPI builds or acquires a glass container manufacturing facility capable of producing products in a location closer to Richmond, California[7] than the Lavington facility, then CPI or Anchor shall undertake to supply products to buyer from such facility, with Buyer's prior written approval.

Encore further argues that use of certain plural terminology within the Amended Agreement, instead of singular, supports its contention that Anchor could have provided product from different or multiple sources. This Court finds Encore's argument that the Amended Agreement did not restrict production to the Lavington Plant unavailing.

Production of bottles under the Amended Agreement was clearly premised upon the production of product at CPI's Lavington Plant. The Amended Agreement specifically states that "[t]he parties contemplate that the product shall be manufactured at CPI's Lavington facility." To interpret the Amended Agreement as Encore suggests would impermissibly

---

[7]Encore's corporate location.

undermine the parties' use of the term "shall" with respect to production of product at the Lavington Plant.  See Thor Seafood Corp. v. Supply Mgmt. Services, 352 F. Supp. 2d 1128, 1131 (C.D. Cal. 2005)(holding that where the contract is clear and explicit, the plain language of the contract governs); see also In re Amica, Inc., 135 B.R. 534, 548 (N.D. Ill. 1992)(applying California law).  In its brief, Encore acknowledges that the wine industry requires a specific type and quality of glass containers and that glass designs are specific to the wine industry and sometimes specific to the winery.  Furthermore, a manufacturer has to pass certain quality runs to certify that a specific plant is able to produce containers of the specific color, design, and quality required.  As Encore admits, the Lavington Plant was certified for production of product and "Encore knew that the Lavington Plant was capable of producing the quality of containers required by Encore's customers."  At the time the Amended Agreement was executed, the Lavington Plant was the only plant owned by either CPI, Anchor or an Anchor affiliate that was approved to meet Encore's production requirements.   Additionally, it is undisputed that neither Anchor nor CPI built or acquired a glass container manufacturing facility capable of producing products in a location closer to Richmond, California than the Lavington Plant.  As such, production of product under the Amended Agreement was clearly restricted to the Lavington Plant.

      b.      Performance Under the Amended Agreement Was Rendered Impossible

Encore, relying in part on Hensler and El Rio Oils, argues that Anchor's inability to produce product from the Lavington Plant due to its sale to Owens does not render performance under that Amended Agreement objectively impossible such that Anchor's performance should be excused.  Namely, Encore contends, "[i]n order to be an excuse for nonperformance of a

11

contract, the impossibility of performance must attach to the nature of the thing to be done and not to the inability of the obligor to do it." The Court rejects this argument.

"Impossibility means not only strict impossibility but impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved." See Restatement (First) of Contracts § 454 (1932); see also Oosten v. Hay Haulers Dairy Emp. & Helpers Union, 291 P.2d 17, 18 (1956)(holding impossibility of performance is a defense and the burden of proof in establishing it rests on the party asserting it); City of Vernon v. City of Los Angeles, 290 P.2d 841, 845-47 (1955)(holding that a thing is impossible in legal contemplation when it can only be done at an excessive and unreasonable cost). Here, the CPI Bankruptcy and subsequent sale of the Lavington Plant during the bankruptcy proceedings are more than a mere difficulty or increased expense from a foreseeable cause. Rather, the sale of the Lavington Plant to Owens undermined a basic term of the Amended Agreement and made production under the Amended Agreement impossible. The sale of CPI's Lavington Plant was beyond the control of Anchor, and Anchor has sufficiently established that its performance under the Amended Agreement was excused due to impossibility.

### **V.**     **Conclusion**

Accordingly, it is **ORDERED AND ADJUDGED** that:

(1)     Encore's request for oral argument is **DENIED**.

(2)     The decision of the bankruptcy court is **AFFIRMED.**

(3)     The Clerk is directed to **CLOSE** this case.

**DONE AND ORDERED** at Tampa, Florida, this 21st day of July, 2006.

/s/ Susan C. Bucklew
SUSAN C. BUCKLEW
United States District Judge

Copies to:
All Parties and Counsel of Record